UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILVERTO HERRERA AND CLAUDIA HERRERA,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANCEONE RECEIVABLE MANAGEMENT, INC.,<br><br>Defendant. | Case No.: 14-cv-1844-BTM-WVG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 100] AND SETTING PRETRIAL AND TRIAL DATES** |

On August 8, 2016, Defendant filed a motion for summary judgment. (ECF No. 100.) For the reasons discussed below, Defendant's motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiffs Gilverto Herrera and Claudia Herrera ("Plaintiffs") brought an action against AllianceOne Receivable Management, Inc. ("Defendant"). The suit arises from Defendant's alleged illegal debt collection practices. (Second Amended Complaint ("SAC"), ECF 74, ¶ 1.)

In the fall of 2010 and spring of 2011, the San Diego Superior Court (SDSC) assigned to Defendant—a collection agency—the collection of three

unpaid traffic fines, owed by an individual named Gilberto G. Herrera. (Decl. of Leo Beltran, in Supp. of Def.'s Mot. Summ. J. ("Def.s' MSJ"), ECF No. 100-2, ¶ 2.) Defendant engaged in efforts, known as "skiptracing," to locate Gilbert G. Herrera. (Beltran Decl. ¶ 3.) Those search efforts resulted in four names associated with the address provided to Defendant, including that of Plaintiff Gilverto Herrera ("Plaintiff Gilverto"). (Beltran Decl. ¶ 4.) Defendant sent Plaintiff Gilverto several notices, but failed to collect the fines. (Beltran Decl. ¶ 6.) On January 20, 2012, Defendant referred the fines to the Court Ordered Debt Collection Program[1] ("COD Program") at the California Franchise Tax Board ("FTB"), pursuant to a written agreement between Defendant and SDSC. (Id.)

In January 2012, Plaintiffs received a notification and "Demand for Payment-Court Ordered Debt Collection" from the FTB. (Decl. of Pl. Gilverto Herrera, in Supp. of Pls.' Opp'n to Def.'s Mot. Summ. J ("Pls.' Opp'n"), ECF No. 102-1, ¶ 2.) The demand was for $1,496 and referenced three cases in the SDSC against a "Gilberto G. Herrera" for unpaid traffic tickets. (Herrera Decl. ¶ 2.) Plaintiffs immediately contacted the FTB and learned that the demand was issued by Defendant in error. (Herrera Decl. ¶ 3.) The demand was addressed to a "Gilberto G. Herrera," an individual with a different date of birth than Plaintiff Gilverto. (Herrera Decl. ¶ 3.) In an effort to resolve the discrepancy, Plaintiffs faxed a letter in February 2012 to the FTB and Defendant, and included a copy of Plaintiff Gilverto's driver license and social security as identification. (Herrera Decl. ¶ 4.) In February and March 2012, Plaintiffs also visited Defendant's office at the SDSC several times in order to correct the misidentification. (Herrera Decl. ¶ 5.)

On March 21, 2012, Plaintiffs were informed by the Internal Revenue

---

[1] The COD Program is a legislatively authorized program by which the FTB withholds and diverts state-income refunds to satisfy court-imposed fines and other court-related obligations. (Def.'s MSJ at 4).

Service ("IRS") that part of their federal income tax refund was seized and $564.62 was sent to the California FTB. (Herrera Decl. ¶ 6.) Plaintiffs subsequently petitioned the SDSC for the return of the funds and to remove the cases from Plaintiff Gilverto's credit report. (Herrera Decl. ¶ 8.) On May 31, 2012, Judge Gary Bloch ruled in favor of Plaintiffs, finding that the names on the citations did not match Plaintiff Gilverto's name. (Id.) Judge Bloch also ordered that the cases be removed from Plaintiff Gilverto's credit record, Defendant's accounts, and the FTB's accounts. (Id.) Plaintiffs provided Defendant with actual notice of the court order. (Id.) Plaintiff Gilverto was also able to remove the citations from his driving record. (Herrera Decl. ¶ 9.)

Notwithstanding the court order, Plaintiffs allege that Defendant continued to contact Plaintiffs on a weekly basis using an automatic telephone dialing system, or "robo-calls." (Herrera Decl. ¶ 10.) Plaintiffs contend that in 2013, they received calls at least once a month from Defendant, including one instance in September when Plaintiffs received at least three telephone calls harassing and seeking payment from them. (Herrera Decl. ¶ 14.)

As a result, Plaintiffs allege that Defendant's actions have harmed their credit score and have induced stress, anguish, and physical and mental harm. (Herrera Decl. ¶¶ 11–12.)

Plaintiffs' SAC alleges six causes of action: (1) conversion; (2) violations of California's Business and Professions Code; (3) negligence; (4) invasion of privacy; (5) violations of California's Consumer Credit Reporting Agencies Act ("CCRAA"); and (7) violations of the Fair Credit Reporting Act ("FCRA").

## II. STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323 (1986).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment*.*" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are

jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

**A.    Conversion**

Plaintiffs allege that Defendant improperly retained or caused the retention of their federal income tax refund by executing a levy on their account. (Compl. 7.)

Under California law, "[c]onversion is the wrongful exercise of dominion over the property of another." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010). To establish conversion, a plaintiff must demonstrate: "(1) [his or her] ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. It is necessary to show that the alleged converter has assumed control over the property 'or that the alleged converter has applied the property to his own use.'" *Id.*

Plaintiffs argue that Defendant is liable for conversion because it served as an agent for the SDSC in interfering with their right to a federal tax refund. (Pls.' Opp'n at 10.) Defendant "contends there is no evidence it (or the Superior Court or the FTB) assumed control of or exercised dominion over Plaintiff's federal tax refund." (Def.'s Reply in Supp. Mot. Summ. J. ("Def.'s Reply"), ECF 106 at 1.) Defendant argues that there is undisputed evidence that the COD program does not forward its collection accounts to the IRS. (Def.'s MSJ at 9.) While Plaintiffs have provided evidence to demonstrate that the IRS levied a portion of their federal tax refund to satisfy a debt on behalf of the FTB, they have failed to demonstrate that it was done to satisfy the accounts Defendant had referred to the FTB. The IRS notice that Plaintiffs received identifies FTB as the government agency collecting the debt, but expressly notes that its purpose is a "state tax obligation"—not a court-ordered debt. According to Carrie Deterding,

FTB's program manager for the COD Program, the COD Program did not receive any money from the IRS and the FTB never remitted any funds to Defendant or the SDSC in connection with the accounts at issue. (Dep. of Carrie Deterding, in Supp. of Def.'s MSJ at 58–59.) In fact, she stated that though FTB has certain programs that refer collection accounts to the IRS's Treasury Offset Program, COD is not among them. (Deterding Dep. At 50.) Plaintiffs have offered no evidence to support its contention that their tax fund was levied in connection with Defendant's account. As a result, Plaintiffs cannot prove that Defendant assumed control over their tax refund.

Consequently, Defendant's motion as to Plaintiff's first cause of action is **GRANTED**.

**B.   Violations of California's Business and Professions Code § 17200**

Defendant moves for summary judgment on Plaintiffs' second claim for violations of the Unfair Competition Law ("UCL"). Plaintiffs allege Defendant's conduct constitutes an unlawful, unfair and fraudulent business practice as described under the UCL.

The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capitol One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Its coverage is broad and sweeping, and embraces "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999).

Defendant's argument is two pronged. First, Defendant argues that Plaintiffs lack standing to bring a claim under the UCL. Second, Plaintiffs have failed to provide evidence to demonstrate that Defendant's conduct was unlawful,

unfair or fraudulent under the UCL. The first issue is dispositive and is addressed below.

### 1. Standing

A plaintiff injured by a violation of the UCL may only seek restitution and injunctive relief.[2] *See* Cal. Bus. & Prof. § 17203. He bears the burden of establishing that he has standing for each type of relief sought. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Standing under the UCL is substantially narrower than federal standing under Article III, section 2 of the U.S. Constitution. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 324 (2011). Under the UCL, only a plaintiff who has suffered an injury in fact and has lost money or property as a result of unfair competition has standing to bring an action for relief. *Id.* at 320–21; Cal. Bus. & Prof. § 17204. To satisfy this standing requirement, the California Supreme Court requires a plaintiff to "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e. *economic injury*, and (2) show that the economic injury was the result of, i.e., caused by the unfair business practice . . . that is the gravamen of the claim." *Kwikset Corp.*, 51 Cal.4th at 322.

Here, Defendant argues that Plaintiffs' UCL claim fails because they have not proved that they lost money or property as a result of Defendant's conduct. (Def.'s MSJ at 11.) Defendant offers as evidence Ms. Deterding's testimony—that the COD Program never received any money from the IRS in connection to

---

[2] Though not raised in their Opposition, Plaintiffs also moved for injunctive relief in their Complaint. (Compl. at ¶ 37). To establish standing to seek injunctive relief, a plaintiff must allege facts that indicate that a defendant is likely to continue utilizing unfair competition practices or that plaintiff will face a similar future harm. *See L.A. v. Lyons*, 461 U.S. 95, 111 (1983). Here, there is no evidence in the record that there is any probability that Defendant will continue to use unfair competitive practices. Likewise, Plaintiffs have not provided evidence to show that they will face similar harm in the future. As such, the Court finds that they do not have standing to seek injunctive relief.

Defendant's accounts—to argue that Plaintiffs' federal tax refund was not seized as a result of Defendant's actions. (Id.) Plaintiffs fail to rebut this evidence. Instead, they attempt to satisfy UCL's standing requirement by asserting emotional distress damages and monetary damages arising from medical visits and having to take time off from work. (Pls.' Opp'n at 24.) However, under the UCL, Plaintiffs' damages are not recoverable.

The UCL allows courts to order restitution[3] and/or "the disgorgement[4] of money that has been wrongfully obtained or, in the language of the statute, an order 'restoring money which may have been acquired by means of unfair competition." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1266 (1992). As such, section 17203 does not provide for monetary damages. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003) ("The fact that the 'restore' prong of section 17203 is the only reference to monetary penalties in this section indicates that the Legislature intended to limit the available monetary remedies under the act."). Plaintiffs' alleged emotional distress damages and associated monetary damages are therefore not recoverable under the UCL. Absent any evidence that Defendant took or was responsible for taking a portion of Plaintiffs' federal tax return, Plaintiffs lack standing as they have failed to assert any injuries that are capable of restitution.

//

---

[3] The California Supreme Court has defined an order for "'restitution' as one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co.,* 29 Cal.4th at 1144–45.

[4] The California Supreme Court has defined disgorgement as much broader than restitution, stating that an order for "'disgorgement' may include a restitutionary element, but is not so limited." It "may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victim of the unfair practice." *Id.* at 1145.

Accordingly, Defendant's motion as to Plaintiffs' UCL claim is **GRANTED**.

## C. Negligence

In their Opposition, Plaintiffs narrow their negligence claim to argue that Defendant breached a duty to properly investigate and validate debts and a duty not to collect from the wrong person. (Pls.' Opp'n at 10.)

The elements for a negligence claim are (1) the existence of a legal duty to use due care; (2) a breach of such legal duty; (3) causation; and (4) damages. *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 500 (2001).

### 1. Legal Duty

Plaintiffs appear to argue that Defendant's duty of care arises from the industry's standard of care and its own policies and procedures. Defendant challenges the existence of a legal duty. As a threshold question, the Court must determine whether a legal duty exists.

A defendant's duty of care is a prerequisite to any claim for negligence. *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095 (1991). "Absent a duty, the defendant's care, or lack of care, is irrelevant." *Software Design & Application, Ltd. V. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 482 (1996). Unlike the factual issues of breach and causation, whether a defendant owes a plaintiff a duty of care is a question of law for a court to decide. *Cabral v. Ralphs Grocery Co.*, 51 Cal.4th 764, 771 (2011). "The legal duty of care may be of two general types: (a) the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated, or (b) an affirmative duty where the person occupies a particular relationship to others." *McGettigan v. Bay Area Rapid Transit Dist.*, 57 Cal. App. 4th 1011, 1016–17 (1997).

As a general rule under California law, "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction

1  does not exceed the scope of its conventional role as a mere lender of money."
2  *Nymark*, 231 Cal. App. 3d at 1096.  "Liability to a borrower for negligence arises
3  only when the lender actively participates in the financed enterprise beyond the
4  domain of the usual money lender."  *Id.*

5  Applying these principles to debt collection practices, courts in California
6  have refused to find that debt collectors have gone beyond the scope of their
7  roles as usual creditors so as to give rise to a legal duty.  In *Inzerillo v. Green
8  Tree Servicing, LLC*, No. 13-cv-6010, 2014 WL 1347175, at *6 (N.D. Cal. Apr. 3,
9  2014), the court found that the defendant, a debt collector, owed no legal duty to
10 engage in fair, honest, and respectful practices in the collection of consumer
11 debts.  There, the facts demonstrated that the defendant called one plaintiff at
12 least six times a day and at all hours, called her parents numerous times, and
13 threatened to change the locks on her house and foreclose on the property.  *Id.*
14 at *1.  Nevertheless, the court found that these facts merely showed that the
15 defendant acted as a loan servicer seeking to collect on a debt.  *Id.* at *6.  It
16 therefore held that the plaintiffs failed to allege the type of duty that California
17 courts would find sufficient to state a claim for negligence.  *Id.*  Similarly in
18 *Sepehry-Fard v. Department Stores National Bank*, No. 13-cv-03131, 2013 WL
19 6574774, at * 2 (N.D. Cal. Dec. 13, 2013), the court found no special legal duty of
20 care on which the plaintiff could assert a negligence claim.  There, the plaintiff
21 based his negligence claim on the defendant's debt collection practices, including
22 attempting to collect the underlying credit card debt even after the plaintiff
23 disputed it, and placing a levy on the plaintiff's bank account.  *Id.*  The court held
24 that the bank's collection efforts did not go "beyond the domain of a creditor
25 seeking to collect on a debt," and the fact that the plaintiff challenged the validity
26 of the debt did not create a special legal duty upon which the plaintiff could rest
27 his negligence claim.  *Id.* at *3.

28 Here, the Court similarly concludes that Defendant's attempt to collect the

1  debt did not go beyond the scope of its role as a creditor, so as to give rise to a
2  special legal duty.  Though this case differs from *Inzerillo* and *Sepehry-Fard* in
3  that here, Plaintiffs were not the true debtors, this fact alone is not enough to give
4  rise to a special legal duty.  As stated by Leo C. Beltran—the Court Support
5  Supervisor for Defendant—after the SDSC assigned it the collection of three
6  unpaid traffic fines, it began its attempts at collecting those debts.  (Beltran Decl.
7  ¶ 5.)  This included sending initial notices to Plaintiff Gilverto, advising him of the
8  various rights he had.  (Beltran Decl. ¶ 6.)  Plaintiffs never responded to the
9  notices, which triggered Defendant to refer the accounts to the COD program at
10  the FTB.  (Id.)  The Court finds that Defendant's actions fall within the scope of a
11  usual creditor and as such, it did not owe Plaintiffs a legal duty of care.

      Moreover, Plaintiffs have not cited to any authority in which courts have imposed a duty on debt collectors to investigate and validate a debt.  Defendant, on the other hand, argues that debt collectors are not required to verify or independently investigate an obligation before communicating about it or trying to collect it.  (Def.'s Reply at 5.)  In all three cases cited by Defendant, the courts held that in light of the bona fide error defense under the Fair Debt Collection Practices Act ("FDCPA"), debt collectors are not required to independently investigate debts referred for collection.  *See Hyman v. Tate*, 362 F.3d, 965 (7th Cir. 2014); *see also Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992); *see also Palmer v. I.C. Sys., Inc.*, No. C-04-03237, 2005 WL 3001877, at *8 (N.D. Cal. Nov. 8, 2005).  Though these cases are decided within the context of the FDCPA, they nevertheless demonstrate courts' reluctance to impose such duties on a debt collector.

      Consequently, Defendant's motion as to Plaintiff's third cause of action is **GRANTED.**

//
//

### D. Invasion of Privacy

As their fourth cause of action, Plaintiffs allege an invasion of privacy. (Compl. at 11.) They specifically argue that Defendant invaded their reasonable expectation of privacy by making unwanted telephone calls to their home.[5] (Compl. at ¶¶ 49–50.)

To prove an invasion of privacy by intrusion under California law, a plaintiff must demonstrate: "(1) intrusion into a private place, conversation or manner, (2) in a manner highly offensive to a reasonable person." *Shulman v. Group W. Prods., Inc.*, 18 Cal.4th 200, 231 (1998). The intrusion must be intentional. *Id.* Only where a plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source, can a court find an invasion of privacy. *Id.* To determine the offensiveness of a given intrusion a court must consider all of the circumstances of the intrusion, including its degree, setting, and the intruder's "motives and objectives." *Id.* at 236. "While what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion." *Deteresa v. ABC,* 121 F.3d 460, 465 (9th Cir. 1997) (citing *Miller v. NBC*, 187 Cal. App. 3d 1463, 1483 (1986)). "If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." *Id.*

#### 1. Highly Offensive

Defendant moves for summary judgment, arguing that Plaintiffs have failed to provide evidence to show that Defendant's conduct was highly offensive to a

---

[5] In their Complaint, Plaintiffs also alleged that Defendant invaded their privacy by conveying inaccurate and improper information to third parties. Plaintiffs have not raised this theory in opposition to Defendant's motion for summary judgment, and as such, have abandoned it. *See Jenkins v. Cnty of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (finding that the plaintiff had abandoned "two claims by not raising them in opposition to the [defendant's] motion for summary judgment.").

reasonable person.  (Def.'s MSJ at 22.)

Courts within the Ninth Circuit have held that repeated and continuous calls in an attempt to collect a debt give rise to a claim for intrusion upon seclusion. See *Panahiasl v. Gurney*, No. 04-04479, 2007 WL 738642, at *3 (N.D. Cal. Mar. 8, 2007) (holding that the defendant's repeated and continuous abusive calling— even after requests that such conduct cease—gave rise to damages for an invasion of privacy).  In *Fausto v. Credigy Services Corporation*, 598 F. Supp. 2d 1049, 1056 (N.D. Cal. 2009), the court found that the plaintiffs had raised triable issues as to an invasion of privacy.  There, the plaintiffs demonstrated evidence that the defendant made over 90 calls to their home, and that the content of those calls was harassing in violation of state and federal laws.  *Id.*  The plaintiffs also offered evidence that the defendants failed to identify themselves when calling, and would allow the phone to ring repeatedly when calling, only to call back immediately after the plaintiffs hung up.  *Id.*  Similarly, in *Joseph v. J.J. Mac Intyre Corportation*, 281 F. Supp. 2d 1156, 1165 (N.D. Cal. 2003), the court held that there were triable issues as to an invasion of privacy where the defendant used an automated dialing system with a pre-recorded voice to make 200 calls over a nineteenth month period.

The parties dispute how many times Defendant contacted Plaintiffs after they obtained the May 31, 2012 court order.  In his declaration, Plaintiff Gilverto stated that Defendant continued to contact them on a weekly basis using an automatic telephone dialing system.  (Herrera Decl. ¶ 13.)  Plaintiff Gilverto also stated that in 2013, Defendant called his home at least once a month using the same automatic dialing system.  (Herrera Decl. ¶ 14.)  Mr. Beltran, on the other hand, stated that between June 28, 2013 and August 30, 2013, a total of six calls were attempted to Plaintiffs' residential number, but none resulted in a conversation between Defendant and Plaintiffs.  (Beltran Decl. ¶ 14.)

Taking Plaintiffs' allegations that Defendant called them at least once a

month in 2013 as true, the Court finds that there is a genuine issue of material fact as to whether Defendant's conduct was highly offensive.[6]  While the cases that Plaintiffs rely on involve far more calls than those at issue here, the volume of calls is just one factor the Court must take into account.  Here, Plaintiffs informed Defendant numerous times that Plaintiff Gilverto did not owe the debt.  They visited Defendant's office to clarify the error.  They even obtained a court order from the SDSC finding that Plaintiff Gilverto was not the true debtor.  Plaintiffs did everything within their capacity to inform Defendant of the discrepancy.  Notwithstanding their efforts, Defendant continued to call them at least once a month in 2013.  Taking all of these circumstances together, the Court finds that Plaintiffs have provided sufficient evidence for a reasonable jury to find that Defendant's conduct was highly offensive.

### 2. Qualified Privilege

In its Reply, Defendant relies on *Bundren v. Superior Court*, 145 Cal. App. 3d 784 (1983), to argue that its collection attempts do not support a claim for intrusion in light of the qualified privilege California affords debt collectors. (Def.'s Reply at 9.)  In analyzing the privilege, the court stated:

> When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. . . . In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt.

*Bundren*, 145 Cal. App. at 789.  The qualified privilege is premised on the idea that the debtor, in accepting credit, impliedly consents to the creditor taking reasonable steps to collect its payment, even though it may result in an invasion of privacy.  *See id.*  Here, Plaintiff Gilverto was not the true debtor.  He was

---

[6] *Compare, Inzerillo v. Green Tree Servicing, LLC*, No. 13-cv-06010, 2014 WL 6660534, at *5–6 (N.D. Cal. Nov. 24, 2014) (finding no cause of action for an invasion of privacy where the defendant called plaintiffs, who were not the debtors, 10-12 times).

mistaken for the true debtor and thus never "impliedly consented" to Defendant taking reasonable steps to collect its payment. The Court therefore concludes that Defendant cannot avail itself of the qualified privilege.

Defendant's motion for summary judgment with respect to Plaintiffs' fifth cause of action is **DENIED**.[7]

### E.   Violations of the CCRAA, § 1785.25(a)

Plaintiffs allege that Defendant furnished and continued to furnish to consumer credit reporting agencies ("CRAs") inaccurate and misleading information despite knowing that the debt was in dispute or incorrect, in violation of section 1785.25(a) of the CCRAA. (Compl. ¶ 56.)

Section 1785.25(a) states that, "[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know that information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

Defendant moves for summary judgment on this claim, arguing that there is no evidence that it knew or should have known any information it may have reported was inaccurate or incomplete. (Def.'s MSJ at 26.) Plaintiffs alleged that Defendant notified the CRAs that Plaintiffs owed debts sometime in September 2010. (Compl. ¶ 13.) Plaintiffs argue that before reporting to the CRAs, Defendant knew or should have known of the inaccuracies. They cite to interrogatory answers to support the fact that they told Defendant about the identity mistake in 2010. (Decl. of Salim Khawaja in Supp. of Pls.' Opp'n, ECF

---

[7] In their Opposition, Plaintiffs for the first time raise a new theory of liability arguing that Defendant invaded their privacy by illegally obtaining their personal and financial information. (Pls.' Opp'n at 20). The Court has discretion to refuse to allow a new theory in opposition of summary judgment where the defendant would suffer prejudice. *See Coleman v. Quaker Oats, Co.*, 232 F.3d 1271, 1292 (9th Cir. 2002) (affirming a district court's refusal to allow a plaintiff who alleged disparate treatment age discrimination in the complaint to argue a disparate impact theory for the first time on summary judgment). Defendant has not had the opportunity to engage in discovery regarding this theory of liability. As such, the Court declines to entertain it.

No. 102-3, Ex. 5, 3–5.)  Plaintiffs state that the telephone calls and messages from Defendant started around 2010 or 2011.  Plaintiffs specifically states "[w]hen I was finally able to speak with one of [the] company representatives, I informed [Defendant] about the wrong person."  (Id.)  Plaintiffs never specify whether this conversation took place before or after September 2010.  (Id.)  The answers to Defendant's interrogatories do not set forth sufficient facts to establish a genuine issue of material fact as to whether Defendant knew or should have known of the discrepancy before furnishing information to the CRAs.

Defendant's motion for summary judgment with respect to Plaintiffs' fifth cause of action is therefore **GRANTED**.

**F.     Violations of the FCRA, § 1681s-2(b)**

Plaintiffs claim that Defendant violated section 1681s-2(b) of the FCRA by failing to conduct proper and adequate investigation of the mistaken identity dispute they submitted to the CRAs.

"[T]o ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy," Congress imposed a series of duties on CRAs and furnishers of credit information under the FCRA.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007); 15 U.S.C. § 1681.  Section 1681s-2(b) specifically imposes duties on furnishers of information.  *Id.* § 1681s-2(b).  "These obligations are triggered 'upon notice of dispute'—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information."  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009).  Under section 1681s-2(b), after receiving notice of the dispute, a furnisher must:

> (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the [CRA] pursuant to section

> 1681i(a)(2) . . . ; (C) report the results of the investigation to the [CRA]; (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete [or] (iii) permanently block the reporting of that item of information [to the CRAs].

§ 1681s-2(b). The case law is clear that "[t]hese duties arise *only* after the furnisher receives notice of dispute from a CRA." *Gorman*, 584 F.3d at 1154 (emphasis added). "[N]otice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b)." *Id.*

Defendant argues that Plaintiffs have failed to provide "evidence [that] any CRA notified [Defendant] that Plaintiffs disputed information furnished by [Defendant] appearing on their credit reports." (Def.'s MSJ at 28.) There is no evidence in the record to demonstrate that Defendant ever received any notice from a CRA. Defendant disputes ever receiving a notice from a CRA. (Beltran Decl. ¶ 15.) Plaintiffs provide no evidence to rebut Defendant's contention. Instead, they put forward evidence that they suffered damages as a result of Defendant's alleged violation of the FCRA. However, that is not enough to establish a genuine issue for trial.

As such, Defendant's motion for summary judgment as to Plaintiffs' sixth cause of action is **GRANTED**.

//
//
//
//
//
//
//

b

## IV. CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is **GRANTED in part and DENIED in part.** The Clerk shall enter judgment for Defendant on claims 1–3 and 5–6. The fourth cause of action for invasion of privacy shall proceed to trial on February 6, 2017 at 10:00 a.m. The pretrial conference shall be held on January 23, 2017 at 10:30 a.m.

**IT IS SO ORDERED.**

Dated: December 5, 2016

Barry Ted Moskowitz, Chief Judge
United States District Court